MODIFIED OPINION ON MOTION FOR REHEARING
IRVING, J„
for the Court.
¶ 1. The motion for rehearing is denied. The previous opinion of this Court is withdrawn, and this opinion is substituted therefor.
¶ 2. This appeal arises from a suit filed by Duffy Morf and Karen Preston Morf against the North Central Mississippi Board of Realtors, Inc. (the Board). Duffy is the broker for a real estate office in Oxford, Mississippi, and Karen is a realtor in the same office. The Morfs’ suit was filed in an effort to challenge sanctions levied against them by the Board. After hearing evidence, the Lafayette County Chancery Court found in favor of the Board and dismissed the Morfs’ suit with prejudice. The Morfs appeal, alleging that the court erred: (1) in granting the Board’s motion for a directed verdict[1] and (2) in applying the law with regard to the Board’s failure to adhere to its own regulations and bylaws.
¶ 3. Finding error, we reverse and remand for further proceedings consistent with this opinion.
FACTS
¶ 4. In 2001 and 2002, the Morfs joined the Board. At the same time, the Morfs joined the Mississippi Association of Realtors (MAR) and the National Associa *1190 tion of Realtors (NAR). Membership in these organizations grants the Morfs the right to call themselves “realtors.” Membership also grants them use of the Multiple Listing Service (MLS), as well as other benefits.
¶ 5. In May 2005, the Morfs were charged with improperly extending an MLS listing without the consent of the owner in violation of the Board’s rules. Thereafter, Karen was found to have violated the Board’s rules, and Duffy was found guilty of failing to properly supervise her. Karen and Duffy were each fined and assigned other sanctions; in addition, Karen was placed on “probation” for one year.[2]
¶ 6. Less than a year later, in May 2006, the Morfs were again charged with violating the Board’s rules. This time, Karen was accused of entering two properties into the MLS when she was not authorized by the seller to do so, and Duffy was again charged with failing to properly supervise Karen. According to the Morfs, the property was inadvertently entered into the system by an assistant at the Morfs’ real estate office. The assistant was supposed to enter the information in “suspension,” a process whereby the listings would not actually be submitted to the MLS. The information was entered on Thursday, May 11, and Friday, May 12. Over that weekend, Karen discovered that the listings had incorrectly been submitted to the MLS. The Morfs stated that they worked immediately to have the listings removed, and both listings were taken down by Monday, May 15. The Board has not presented any evidence contradicting the Morfs’ explanation of what happened. The Board’s representative admitted at trial that no one except the Morfs had suffered any harm as a result of the improper listings.
¶7. The Board advised the Morfs that they were being charged with violating the Board’s rules because of the improper listings. The Morfs were told to attend a hearing on May 31, 2006. However, the hearing was not held until early June. After the hearing, the Morfs were found to be guilty of violating the Board’s rules. For failing to properly supervise Karen, Duffy was assessed a fine of fifteen hundred dollars and given a forty-five-day suspension from the MLS. Duffy was also required to attend a mandatory orientation session. Karen was expelled from membership with the Board for one year, which means that Karen will not be able to use the title of realtor and will not be able to access the MLS and its benefits during that year. Furthermore, Karen’s reinstatement by the Board is not guaranteed. The Board’s rules also require that anyone in the Morfs’ office will be unable to use the MLS and other services until Karen is reinstated by the Board or until she leaves the Oxford office.
¶ 8. After exhausting all remedies with the Board, the Morfs appealed the Board’s decision to the Lafayette County Chancery Court. The court noted multiple times throughout the course of the trial that the Board’s regulations were difficult to understand and a “mess.” Regardless, and with little in the way of explanation, the court found in favor of the Board and dismissed the Morfs’ complaint.
¶ 9. Additional facts, as necessary, will be related during our discussion and analysis of the issue.
*1191 ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 10. At the close of the Morfs’ case, the Board moved for a directed verdict. Although the Board moved for a directed verdict, the Board should have moved “for a dismissal on the ground that upon the facts and the law the [Morfs had] shown no right to relief.” M.R.C.P. 41(b). Therefore, we proceed under the standard of review for an involuntary dismissal pursuant to Rule 41(b). In Gulfport-Biloxi Regional Authority v. Montclair Travel Agency, Inc., 937 So.2d 1000, 1004-05(¶ 13) (Miss.Ct.App.2006) (citing Stewart v. Merchants National Bank, 700 So.2d 255, 259 (Miss.1997)), this Court held:
A judge should grant a motion for involuntary dismissal if, after viewing the evidence fairly, rather than in the light most favorable to the plaintiff, the judge would find for the defendant. Id. (emphasis added). “The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiffs evidence were all the evidence offered in the case.” Id. In reviewing a trial court’s grant or denial of a Rule 41(b) motion for involuntary dismissal, we apply the substantial evidence/manifest error standards. Id.
Our supreme court has also held that “questions of law are reviewed de novo, and the reviewing court will reverse if the law has been applied or interpreted erroneously.” Martin v. Lowery, 912 So.2d 461, 464(¶ 7) (Miss.2005) (citing Miss. Transp. Comm’n v. Fires, 693 So.2d 917, 920 (Miss.1997)).
¶ 11. Further, the Mississippi Supreme Court has explained the procedures that a private organization such as the Board must follow in punishing its members:
[I]t is highly desirable that private organizations, such as MLS and the Board, have the right to discipline members for violations of standards of professional conduct as set out by the constitution, bylaws, rules and regulations of the respective organizations. However, we also are of the opinion that before a fine can be imposed a private association must have a schedule of maximum fines that may be imposed to which schedule each member has agreed to be bound by joining the association. To hold that an association might arbitrarily prescribe fines for each individual offense as it sees fit would make possible and invite an abuse of authority. A fixed, reasonable fine, in the nature of liquidated damages, for injuries sustained because of unprofessional or unethical conduct would be sustained.
Multiple Listing Serv. of Jackson, Inc. v. Century 21 Cantrell Real Estate, Inc., 390 So.2d 982, 986 (Miss.1980).
¶ 12. Having reviewed the record and the relevant rules and regulations, we conclude that the Board acted arbitrarily in punishing the Morfs. Specifically, we find that the Board did not act in accordance with its own rules in disciplining the Morfs.
¶ 13. At the outset, we note that the rules used by the Board appear to consist primarily of three documents, two of which are specific to the Board. First, the Board has its own Rules and Regulations, and second, the Board has its own Bylaws. In addition, the Bylaws specifically state that the Code of Ethics and Arbitration Manual (the Code), which is promulgated by the NAR, is considered a part of the governing rules of the Board. Confusingly, the Board’s Rules and Regulations and Bylaws also reference a Code of Ethics that is supposed to have been published by the Board. However, no such document exists before us, and the Board’s representative stated at trial that the Code of Ethics *1192 simply refers to the Board’s Rules and Regulations and Bylaws.
¶ 14. In short, the Board utilizes a variety of documents, none of which clearly explain their relationship to the other rules. In particular, the Board’s own documents make it difficult to tell which punishments are to be imposed for which violations. The chancellor recognized this throughout the trial of this matter; he eventually opined that not even the Chief Justice of the United States Supreme Court would be able to sort through the chaos of rules promulgated by the Board. However, the chancellor ultimately ruled in the Board’s favor, although with little explanation for why he did so, as can be seen from his bench ruling:
You got all sorts of procedures in everything that you have got. This has just been a hodgepodge, but it’s up to me to determine whether or not due process was had. Whether or not the penalty— if due process was had, whether or not the penalty imposed upon the Morfs was arbitrary and capricious.
I came up here this morning early, and I went through the Ethics Manual.... And after reviewing it and reviewing the others, the Court is going to find that due process was had and it was not arbitrary and capricious; and I’m going to allow the ruling of the Board of Realtors to stand.
¶ 15. The major dispute in this case concerns two essential issues: whether section seven of the Rules and Regulations applies to the Morfs’ conduct, and if not, whether the sanctions imposed are consistent with the punishment allowed by all of the Board’s governing documents.
¶ 16. We agree with the chancellor that section seven most likely should not apply to the Morfs’ conduct. Section seven of the Rules and Regulations reads as follows:
Section 7 — Compliance with Rules
Compliance with Rules: For failure to abide by these MLS Rules and Regulations and any violations within a quarter, the following sanctions may be imposed for non-compliance. (Amended 10/0U)
1st [0]ffense — A warning issued to Participant that offense has occurred and that additional sanctions will be imposed if failure to comply with the rules is not corrected within one (I) business day. For repeat offenses by the same agency in a four-month period, no warning call is warranted.
2nd [Ojffense — $50.00 fíne and Participant and/or subscriber will appear before the MLS Committee. Failure to appear before the MLS Committee will lead to suspension of service and additional fines and sanctions will be determined by the MLS Committee and Board of Directors.
3rd Offense and Subsequent Office [sic] — $100.00 fine levied against Participant and mandatory sixty (60) day suspension.
Fourth [0]ffense within any four-month period will result in Participant and all affiliated subscribers being suspended from access to and use of the MLS service for a period of up to 60 days.
Any listings which does [sic] not fulfill the minimum requirements of the service, or contains false or misleading information, may be deleted from the service with approval by a majority vote of the MLS [C]ommittee and with 24 hours notice to Participant.
For more than four (4) sanctions in any three (3) month period the violation will be submitted to the MLS [C]ommittee for possible additional sanctions including possible suspension of services as outlined under Section 9.
*1193 For failure to pay any sanctions levied under Section 7 or 9 within 24 working business hours the service shall be suspended for sixty (60) days unless notification in advance must be approved by the MLS Committee [sic].
For failure to comply within the 60 days of the sanctions will result [sic] in your membership being reviewed by the Board of Directors.
Violation of Rules and Regulations includes, but is NOT limited to:
Failure to provide complete and accurate information on any MLS listing.
Failure to complete any required MLS mandatory fields with accurate information.
Failure to timely file any listing with the service as required in Section 1.
Failure to submit a photo on any listing with improved property that covers no less that [sic] 75% of the allowed space. Photo must be submitted within 48 hours of filing with the services. The [p]hoto can not [sic] have your company sign in it.
For entering incorrect or inappropriate information in the “Agent News” section on the Bulletin Board.
For entering information into the Remarks section of the MLS that would reveal the name, address, phone or other contact information on the listing agent or office as outlined in Section 18.3.8.
For failure to report to the MLS that a new licensee has been hired by the participant.
For failure to notify the MLS within twenty-four (24) hours upon termination/resignation of the employee or licensee who has been issued a Login ID and password.

For failure to comply with any other rule, the provisions of Section 9 will apply.

(Emphasis added). Although section seven does not explicitly state that it applies only to petty offenses, the Board’s representative claimed that it was understood that section seven applies only to minor offenses. The Morfs were penalized with much harsher sanctions than allowed by section seven both in 2005 and in 2006. However, as the representative explained, the Morfs’ violations were not considered minor or petty.
¶ 17. Although section seven is poorly written, inasmuch as it states that the list of violations is not exclusive and then claims that every other violation is to be considered under section nine, the violations listed are of substantially less import than the violations with which the Morfs were charged. Notably, neither the Morfs’ specific violations nor anything similar were given in the list in section seven. Therefore, the Morfs should have been aware that their conduct would fall under section nine.
¶ 18. Section nine states as follows:
Section 9 — Enforcement of Rules or Disputes
Listings must be completely filled out, legible, and must have a photograph that covers no less than 75% of the allowed space, furnished within 48 hours from the time the listing Broker receives the listing, to the MLS. If any listing is discovered to be incomplete, it shall immediately be rejected by the MLS and returned to the Broker. MLS reserves the right to charge a fee to resubmit this listing. Subdivision or commercial lots (multiple) shall have lot numbers placed *1194 on the lots for ease of identification. (Amended 11/05)
Section 9 of the Rules and Regulations covers sanctions and procedure for hearing requests as a result of such sanctions. Furthermore, the North Central Mississippi Board of REALTORS® may impose sanctions, including but not limited to a written reprimand being placed in the agent’s personal file; a fíne to be determined by the MLS committee Hearing Panel (not to exceed $5,000) and deposited in the MLS account; a levy of fees for administrative costs; suspension of the Broker (Participant) and all affiliated subscribers from using the MLS for up to 60 days or permanent suspension of the Participant from the Multiple Listing Service. (Amended 11/05)
Consideration of Alleged Violations: The Committee shall give consideration to all written or otherwise appropriately reported complaints having to do with violations of the rules and regulations. (Amended 2/98)
Section 9.1 — Violations of Rules and Regulations: If the alleged offense is a violation of the rules and regulations of the Service and does not involve a charge of alleged unethical conduct or request for arbitration, a hearing will be held by a Hearing Panel comprised of members of the Multiple Listing Service Committee, and, if a violation is determined, the Hearing Panel may direct the imposition of sanction [sic]. The recipient of such sanction may request an appeal before the Board of Directors of the Board of REALTORS® within twenty (20) days of the tribunal’s decision being rendered. (Amended 2/OS)
Clearly, the punishment inflicted on the Morfs was within the limits prescribed by section nine. However, simply because discipline fits within the possible limits does not mean that the punishment was imposed fairly and reasonably. Although the Board’s local Rules and Regulations provide little guidance as to what sanctions are appropriate for what circumstances, the Code expounds at length on how to determine an appropriate sanction for a given violation.
¶ 19. We note at this point that the local rules promulgated by the Board do not specifically prohibit the conduct that Karen engaged in. Karen was charged with violating section 1.1, which reads: “Any listing taken on a contract to be filed with the Multiple Listing Service is subject to the rules and regulations of the Service wpon signature of the seller(s).” (Emphasis added). We surmise that the Board interprets this provision to mean two things: (1) that a listing taken via a contract is subject to the rules and regulations and (2) that the signature of the seller must be obtained prior to the listing being placed in the MLS. This second interpretation of section 1.1 is strained at best. However, the Morfs’ actions were clearly prohibited under Standard of Practice 12-4 in the Code, which reads: “REALTORS® shall not offer for sale/ lease or advertise property without authority.”
¶ 20. As we have already mentioned, the Board’s Bylaws clearly incorporate the Code in its entirety. Article VII, Section 1 reads in part:
The responsibility of the Board and of Board Members relating to the enforcement of the Code of Ethics, the disciplining of Members, and the arbitration of disputes, and the organization and procedures incident thereto, shall be governed by the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, as amended from time to time, which is by this reference incorporated into these *1195 Bylaws, provided ... that any provision deemed inconsistent with state law shall be deleted or amended to comply with state law.
(Emphasis added). At trial, issue was made of whether this section applies to violations other than ethics violations. We note that Article VI, Section 2 of the Bylaws reads in relevant part:
Any REALTOR® ... may be disciplined by the Board of Directors for violations of the Code of Ethics or other dtities of membership, after a hearing as described in the Code of Ethics and Arbitration Manual of the Board, provided that the discipline imposed is consistent with the discipline authorized by the Professional Standards Committee of the NATIONAL ASSOCIATION OF REALTORS® as set forth in the Code of Ethics and Arbitration Manual of the National Association.
(Emphasis added). The section clearly states that the Code applies to violations of “other duties of membership” as well as ethical violations. Furthermore, the specific violation that Karen was charged with is clearly delineated in the Code. We have already related our supreme court’s holding in Multiple Listing Service, wherein it held that “before a fine can be imposed[,] a private association must have a schedule of maximum fines that may be imposed.... ” Multiple Listing Service, 390 So.2d at 986. However, we do not find the holding in Multiple Listing Service to mean that an association may impose any fine that it wants, as long as that fine is listed somewhere in the association’s rules and regulations. Rather, we find the word “schedule” to imply that the association must have something indicating which fines are appropriate for certain acts of misconduct. Here, section nine encompasses the punishment imposed by the Board, but there is nothing in section nine to establish what degree of punishment should be levied for what sort of infraction. However, the Code, which has been adopted and incorporated into the Board’s rules and regulations, does contain specific information. Therefore, we find that the Code, which specifically prohibits Karen’s conduct and which has a recommended punishment for that conduct, should govern the sanctions received by the Morfs.
¶ 21. The introduction to the Code discusses the value of membership in an organization such as the Board: “Membership in a Board of REALTORS® has been recognized by the courts as a valuable property right. Therefore, any action ... limiting or denying the rights and privileges of a member must be justified, not only substantively but also procedurally.” The Code then goes on to provide the range of punishments that are available against a member: (1) a letter of warning placed in member’s file, (2) a letter of reprimand placed in member’s file, (3) requirement that the member attend a course or seminar educating himself or herself about ethics or other “appropriate” subject matter, (4) an appropriate and reasonable fine not to exceed five thousand dollars, (5) probation for thirty days to one year, (6) suspension of membership for thirty days to one year with automatic reinstatement in good standing at the end of the period, (7) expulsion from membership for thirty days to one year with termination of MLS rights for a period of one to three years, (8) suspension or termination of MLS rights for thirty days to three years, and (9) imposition of administrative processing fees in an amount up to five hundred dollars. Karen’s expulsion is one of the most severe penalties that can be levied against a member for any violation.[3]
*1196 ¶22. The Code goes on to provide guidelines to boards attempting to impose sanctions against a member. As explained in the Code, “any sanction must always fit the offense and must involve every consideration of justice, equity, and propriety. Because of this, a wide range of sanctions are available to vindicate violations of the Code.” Appendix VII to Part Four discusses sanctioning guidelines, and reads, in relevant part, as follows:
Fundamental to fair and consistent Code enforcement is reasonable and judicious use of discipline, as both an educational device and as punishment. The Manual authorizes a wide variety of sanctions that may be imposed for ethics violations and for violations of other membership duties.
‡ ⅜ ‡ ⅜ ⅜ ‡
The National Association does not recommend specific discipline for certain offenses, or for violations of particular Articles of the Code. This is in deference to the wisdom and autonomy of Hearing Panels privy to the details of complaints coming before them; in recognition of the fact that no two complaints are identical; and in view of the fact that the details of each hearing, including the experience of respondents, their history of prior violations, and mitigating or extenuating circumstances, may all come into play in determining an appropriate penalty. At the same time, there are key points to be considered with respect to discipline.
Discipline that can be imposed is strictly limited to those forms authorized in the Manual.
Discipline should be commensurate with the offense. Unintentional or inadvertent violations should result in penalties designed to educate respondents as to the conduct expected of them as REALTORS®. Only authorized forms of discipline may be utilized.
Discipline should be progressive.... Repeated or subsequent violations should be addressed with more serious forms of discipline including substantial fines, suspension, and termination of membership.
•1» ⅝ ⅜» H* H* ⅜
Mitigating or extenuating circumstances should be considered in determining appropriate discipline. The fact that a respondent recognized or acknowledged inappropriate or unethical conduct, or took steps to remediate or minimize harm or injury that may have resulted from the respondent’s conduct, should be considered in determining appropriate discipline.
Respondents’ records of earlier violations (or, conversely, the fact that they have not violated the Code in the past) can be considered in determining appropriate discipline. Hearing Panels cannot consider past violations in deciding whether the conduct currently complained of violated the Code.
(Emphasis added). Several aspects of this section should have been taken into consideration in crafting discipline for the Morfs. Although the Board found that Karen’s violation was done “knowingly and intentionally,” that finding appears to have been based on her admission that she did not have authorization to post the listing when it was posted and on the fact that she had a previous disciplinary violation. However, according to the only account given, the improper listing was the result of a clerical *1197 error by an office assistant. The Board offered no evidence to refute this account of how the listing was posted. We find that, according to these guidelines, the discipline inflicted on the Morfs should have been limited to penalties intended to educate them as to their mistake. Furthermore, there is no evidence that the Morfs ever attempted to conceal or ever refused to acknowledge the mistake made by their assistant. Therefore, the Morfs’ candid admission of wrongdoing should have operated as a mitigating circumstance. Finally, the Morfs claimed, without contradiction, that they immediately attempted to remedy the situation by having the improper listings removed as soon as they were discovered. This also should have operated as a mitigating factor in support of more lenient discipline.
¶ 23. In another section, the Code provides a list of factors that panels should consider in crafting discipline for violations, including: (1) the nature of the violation, (2) what harm was caused by the violation, (3) whether the violation was intentional, (4) how much experience the realtor had, (5) previous violations and their similarity and proximity in time to the current violation, (6) mitigating circumstances, (7) acknowledgment of the violation, and (8) any other relevant factors. Although many of these were addressed above, we note again that the Board’s representative admitted that no harm was actually caused to anyone other than the Morfs as a result of the improper listing.[4] The fact that absolutely no harm was caused to anyone as a result of the misconduct also should have been taken into account by the Board when it penalized the Morfs. Judging from the harsh penalties imposed on the Morfs, it appears that very little in the way of mitigation was applied to the Morfs’ cases.
¶24. The Code goes on to give examples of punishment for both first-time offenders and for repeat offenders. In “Repeat Violations Example # 2,” which is for a second violation within three years, the Code suggests that if the violation is “considered relatively serious” or if the violation caused “some harm or injury ... to others,” or if the violation showed disregard for the Code, then possible discipline might include: attendance at an educational course, a fine of $2,000 or less, probation for six months or less, suspension for three months or less, or any combination of those penalties. “Repeat Violations Example #3,” again for a second offense within three years, recommends, upon a finding of a “very serious” violation, “substantial harm or injury caused to others,” or knowing disregard for the Code: attendance at an educational course, a fine of up to $3,500, probation for one year or less, suspension for six months or less, or any combination of those penalties. Therefore, even if the misconduct committed by the Morfs in 2006 were considered “very serious,” the penalty imposed, at least as to Karen, is greater than what is suggested by the Code.
¶ 25. Of special interest is the detailed example of “progressive” discipline found in the Code. In the Code’s example, Realtor B, who had recently received his license, failed to disclose to his client, the seller of the property in question, that the buyer for the property was Realtor B’s wife. The Code noted that the hearing panel found that Realtor B “had knowingly concealed from his client a key fact that might have influenced the client’s decision to accept the offer....” Despite the seri *1198 ous and blatant nature of the offense, the Code indicates that an appropriate penalty would be a twenty-five-hundred-dollar fíne and “retaking the ethics orientation required for new members.” As we have already discussed, the only evidence presented indicated that the violation here was apparently not intentional and was simply inadvertent. Despite that fact, Karen was expelled from the Board for one year. There is no doubt that, over time, the expulsion for one year would cost the Morfs much more than a twenty-five-hundred-dollar fíne.
¶ 26. Even more telling is a look at some of the other discipline imposed by the Board in question. Several actual cases were presented as evidence at trial. In none of the cases did the individuals receive discipline as harsh as the discipline received by the Morfs. The Board’s representative admitted during questioning that, during his time on the Board, he knew of no other individual who had been expelled for any violation. In one case presented, an individual was found to have committed numerous violations, including a violation of section 1.1, the same section that Karen was charged with having violated. However, the individual in question received only a one-thousand-dollar fine, a suspension from the MLS for thirty days, a period of mandatory attendance at an orientation session, and an administrative fee in the amount of two hundred fifty dollars. The letter of reprimand does not indicate whether the individual had any prior violations.
¶ 27. In another case, two individuals were found to have violated sections 1.1, 1.4, 1.5, and 1.10. The individuals were found in violation of not only the same section as Karen, but also of three other sections. Each individual received a fine of thirteen hundred dollars and was suspended from the MLS for thirty days. This letter of reprimand attempted to explain how the realtors in question violated section 1.1, but the Board’s summary of the improper conduct was unhelpful: “Rule ignored during regular contractual transactions entered into the MLS by an agent of this firm.” The letter failed to indicate whether the individuals had prior •violations.
¶ 28. In a third case, an individual was found to have violated sections 1.1, 2.7, and 4.1. Unlike Karen and the three other individuals discussed, this violator received only a fine of one thousand dollars, an administrative processing fee of two hundred fifty dollars, and a mandatory attendance at an orientation session. Notably, the individual was not suspended from the MLS service for any period of time.
¶ 29. Having reviewed the Code, as well as the Board’s Rules and Regulations and its Bylaws, it is clear to this Court that the Board acted arbitrarily and capriciously in disciplining the Morfs. The guidelines contained in the Code do not appear to have been followed in any way. Furthermore, the penalties were not commensurate with the discipline imposed on other violators by the same Board. Accordingly, we reverse and remand for consideration of more appropriate discipline for the Morfs’ violations. On remand, the mitigating factors found in the Code should be taken into account, as should the punishments received by other individuals before the same Board.
¶ 30. THE JUDGMENT OF THE CHANCERY COURT OF LAFAYETTE COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
*1199 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.

. We note that this matter was tried before a chancellor, not a jury. Hence, it is inappropriate to characterize the chancellor’s action dismissing the Morfs' complaint as granting a directed verdict. Therefore, we recast the issue as whether the court erred in refusing to grant a permanent injunction enjoining enforcement of the sanctions imposed on the Morfs. We also address the second issue as a part of our discussion of the first issue, as the two are interrelated.

. The Morfs and the Board dispute what is meant by "probation.” Regardless, it is clear that the Morfs' 2005 violations were properly taken into account as aggravating factors for the Morfs’ ensuing 2006 charges.

. Of course, Karen could have been expelled for three years. However, as we have already *1196 stated, regardless of the length of the expulsion, there is no guarantee of readmission once a member has been expelled.

. The representative testified that the violation could have had an impact on other realtors. However, he admitted that, in this case, the only individuals who actually suffered harm as a result of the improper listing were the Morfs.